HITNER SONS CO. *v.* UNITED STATES (No. 2518) [1]

CONSTRUCTION, R. S. 3—"VESSEL"—JUNK.

In order to be a "vessel" (R. S. 3) and subject to tonnage duty and not an importation subject to import customs duties, a thing must be capable of being used for the transportation of persons or property from place to place to a substantial extent or for practical purposes. *Thayer* v. *United States,* 2 Ct. Cust. Appls. 526. It must be capable of engaging in maritime service and of rendering some service in relation to commerce or navigation. That it has the shape of a vessel, has been once used as one, or could, by proper appliances, be again so used, can not affect the question. The test is its actual status as being fairly engaged in, or suitable for, commerce or navigation and as a means of transportation on water. The ruins of a vessel, shown to be fit for nothing but scrap or junk, and towed into the United States for such, is not a vessel; but is imported merchandise.

United States Court of Customs Appeals, November 4, 1922

APPEAL from Board of United States General Appraisers, Abstract 48249

[Reversed.]

*Comstock & Washburn (J. Stuart Tompkins* of counsel) for appellants.
*William W. Hoppin,* Assistant Attorney General (*J. G. Lerch,* special attorney, of counsel), for the United States.

[Oral argument Oct. 5, 1925, by Mr. Tompkins and Mr. Lerch]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

This case involves the dutiable status of the former Canadian cruiser *Niobe,* brought within the customs jurisdiction of the United States at the port of Philadelphia by appellant August 16, 1922. On September 15, 1922, it was entered by the appellant as scrap metals fit only to be remanufactured, and as such, free of duty. It was classified for duty by the collector at 20 per centum as manufactures of metal not specially provided for, under paragraph 167, tariff act of October 3, 1913. The appellant protested, claiming his importation to be entitled to free entry either as old junk, under paragraph 522, or as scrap iron or scrap steel under paragraph 518; there were also alternative claims under paragraph 384, as waste, under paragraph 154 as metals unwrought and under paragraph 385 as nonenumerated articles; by amendment it was also claimed that so much of the mer-

---
[1] T. D. 41175.

chandise as consisted of brass or old brass, fit only for remanufacture, was free from duty under paragraph 430 of said act, and that so much of the same as consisted of old copper was free of duty under paragraph 461 thereof.   The protest was overruled and the matter went to the Board of General Appraisers.   There, after a hearing, the board held the *Niobe* was a vessel, within the meaning of section 3, R. S., and as such, subject to the navigation laws and tonnage duties of the United States, and was therefore not subject to the duties imposed by the tariff act of October 3, 1913, or to any other customs duties; it thereupon held the board had no jurisdiction of the subject matter and dismissed the protest, leaving the classification and assessment of duty made by the collector in full force and effect.   A rehearing was afterwards granted by the board, but on rehearing the board 'adhered to its original ruling.

It must first be determined whether the *Niobe*, at the time it entered the jurisdiction of the United States, was a vessel, as defined in section 3, R. S., and as such, subject to the navigation laws and tonnage duties, or whether it must be considered as imported merchandise, subject to customs duties.   To determine this matter, an examination of the facts, as shown by the record, is necessary.

The uncontradicted testimony shows that the *Niobe* was an armored cruiser of 11,000 tons burden, 462 feet long, 69 feet wide and 27½ feet deep, built by the British Government in 1897, at a probable original cost of $1,000,000.   In 1910, the Canadian Government purchased it and commissioned it for patrol duty in Canadian waters.   In 1915 it was condemned, taken out of active service and dismantled, its guns and ammunition being removed.   Thereafter the *Niobe* was used intermittently as a barracks until sometime in 1920; during that time her machinery was not used, but steam for the uses of her occupants was furnished from a shore line.   The *Niobe* suffered severe injuries from an explosion in Halifax Harbor in 1915.   In August, 1922, the *Niobe* was purchased by appellant from the Canadian Government for $40,000 and was thereafter towed from Halifax to Philadelphia by two tugs.   For about two weeks prior to her departure from Halifax, workmen were aboard, attempting to repair her machinery.   There was a large amount of bilge 'water aboard, and an attempt was made to free her from this by means of her own pumps; because of the impossibility to maintain steam, this could not be done, only about one-half the water being removed.   The *Niobe* was totally unable to maintain steam to propel herself, or even to raise her own anchor either at Halifax or later at Philadelphia.

On the voyage to Philadelphia the *Niobe* was in charge of a crew and mate sufficient to care for her while being towed; she had no license to navigate and no pilot on board.   On arrival at Philadelphia the *Niobe* was inspected and passed quarantine August 16, 1922,

and the mate in charge, as master, filed a manifest on the same date. Thereafter proceedings were had for the entry of the *Niobe* as merchandise, as heretofore stated.

The uncontradicted testimony of members of the crew of the *Niobe* on her trip to Philadelphia is to the effect that her steam machinery was unable to perform any function for which it had been installed; that the steam lines were disconnected, the hoisting engines scrapped, the freezing system out of commission, and the electrical machinery disconnected.

During the first week in November, 1922, Howard Fisher, superintendent of the Kensington shipyards of William Cramp & Sons Shipbuilding Co., and a man of wide experience in the examination of ships, examined the *Niobe* to ascertain if she might be used as a vessel. He found, and so testified, that the *Niobe* was absolutely useless at that time as a merchant ship, a barge, or a cruiser; that her machinery could not be removed and used in another ship without building a new hull of exactly the same dimensions; and that, in his opinion, the *Niobe* was fit only for scrap or junk.

John W. Mowatt, admiralty surveyor for the port of Philadelphia for 16 years, examined the *Niobe* December 16, 1922, on a writ of survey from the United States District Court for the Eastern District of Pennsylvania. He inspected the hull and all the machinery and equipment aboard, and after doing so testified the *Niobe* could not be made into a merchant vessel and could be used only for junk except as to an item of about 150 fathoms of anchor chain.

While there is some question as to these examinations being made at some considerable time subsequent to the date of the arrival of the *Niobe*, the uncontradicted testimony of Joseph G. Hitner, who saw and inspected the *Niobe* when she was first entered, and also when examined by Fisher and Mowatt, is to the effect that the condition of the *Niobe* was substantially the same at both times.

It is also uncontradicted that the hull of the *Niobe* was too unwieldy for a merchant vessel, was narrow and sharp below, and of low cargo capacity. The metal deck plates were rusted and full of holes.

In addition to this testimony, the report of the appraiser in answer to the protest states: "The hull of the ship is fit only for scrap."

In view of these facts, clearly established by the record, was the *Niobe* a vessel within the meaning of section 3, Revised Statutes, on the 16th day of August, 1922?

A distinction was made by the First Congress of the United States between goods, wares, and merchandise imported into our country and vessels entering our ports engaged in navigation or commerce. The second act enacted by that Congress was one imposing certain duties on goods, wares, and merchandise imported; the third was one imposing certain tonnage duties on vessels entering our ports.

1 Stat. L., Chaps. II and III. Since that time this distinction has been preserved.

It has been universally conceded throughout all the decisions and rulings of the Department of the Treasury and the adjudications on the subject during all that period that if any structure entering our ports is a vessel and as such subject to tonnage duties, or such other impositions as might at the time be provided by law in lieu thereof, such vessel could not be subjected to import customs duties. At the time the *Niobe* entered the port of Philadelphia such tonnage duties were provided for by law. Tariff act of August 5, 1909, sec. 36.

Congress, by section 3, Revised Statutes, thus defined the word "vessel":

SEC. 3. The word "vessel" includes every description of water craft or other artificial contrivance used, or capable of being used, as means of transportation on water.

The courts of our country have had frequent occasion to discuss and decide what were and were not to be considered "vessels" under this definition. While these decisions are not uniform and are sometimes conflicting, a fairly definite construction can be gathered from them all. Without attempting any general résumé of the authorities, the citation of a few of them will suffice for our purposes here.

A barge, without power of self propulsion, has been held to be a "vessel," and subject to the navigation laws. *Disbrow* v. *Walsh Bros.*, 36 Fed. 607; *The Wilmington*, 48 Fed. 566; *The Dick Keys*, Fed. Cas. No. 3898; *Ex parte Easton*, 95 U. S. 68. Likewise, scows, capable only of moving when towed, and used for the transportation of mud and similar substances, are "vessels." *Endner* v. *Greco*, 3 Fed. 411; *The General Cass*, Fed. Cas. No. 5307; *In re Eastern Dredging Co.*, 138 Fed. 942. A raft of lumber has been so held. *Seabrook* v. *Raft*, 40 Fed. 596; *The Annie S. Cooper*, 48 Fed. 703. A similar ruling has been made concerning a floating grain elevator. *The Hezekiah Baldwin*, Fed. Cas. No. 6449. Dredge boats are "vessels." *The Alabama*, 19 Fed. 544, aff. in 22 Fed. 449; *The Pioneer*, 30 Fed. 206; *Aitcheson* v. *Endless Chain Dredge*, 40 Fed. 253; *The Starbuck*, 61 Fed. 502; *Saylor* v. *Taylor*, 77 Fed. 476; *McRae* v. *Bowers*, 86 Fed. 344; *Bowers* v. *Federal Con. Co.*, 148 Fed. 290; *Ellis* v. *United States*, 206 U. S. 246. The old dismantled hull of a river steamboat, being refitted for use as a wharf boat in landing passengers and merchandise, was held to be a "vessel." *The Old Natchez*, 9 Fed. 476.

On the other hand, a boat converted into a hotel and saloon by structures erected upon its old hull, was held not to be a "vessel," as not fairly engaged in commerce or navigation. *The Hendrick Hudson*, Fed. Cas. No. 6355. A coal barge, being merely a box of

rough lumber, for floating coals, and intended to be broken up at the end of its voyage, was considered not a "vessel." *Jones* v. *Coal Barges*, Fed. Cas. No. 7458; *Wood* v. *Two Barges*, 46 Fed. 204. A marine-pump, capable of being towed, but set on piles, was not a "vessel." *The Big Jim*, 61 Fed. 503. This was also held as to a floating pile driver. *Pile Driver*, E. O. A. 69; *Lawrence* v. *Flatboat*, 84 Fed. 200, aff. in 86 Fed. 907. A like ruling was made in the case of a suction dredge, although it would appear this ruling was probably not in harmony with other like cases before that time decided. *In re Hydraulic Steam Dredge No. 1*, 80 Fed. 545. A floating platform, moored to enable persons to pass from small boats to the shore, was held not to be a "vessel." *Woodruff* v. *One Scow*, 30 Fed. 269; *Ruddiman* v. *Scow*, 38 Fed. 158. Floating dry docks have also been so held. *Snyder* v. *Dry Dock*, 22 Fed. 685; *Berton* v. *Tietjen, etc.*, 219 Fed. 763 (771); *Cope* v. *Vallette*, 119 U. S. 625.

The preceding decisions were rendered in cases in which the general admiralty jurisdiction of the courts was challenged. On several occasions, however, the courts have been called upon to determine directly whether a certain thing was subject to customs or tonnage duties.

*The Conqueror*, 49 Fed. 99, was the case of a fully equipped pleasure yacht, purchased abroad by an American citizen and brought within the jurisdiction of this country under her own steam. The collector at the port of New York held the *Conqueror* to be imported merchandise or goods and assessed customs duties against her. The court, after a review of the authorities, held the *Conqueror* to be a "vessel" within the meaning of section 3, Revised Statutes, and hence not subject to customs duties. This case finally came to the Supreme Court on certiorari and the judgment of the district court as to the dutiable status of the *Conqueror* was affirmed. *The Conqueror*, 166 U. S. 110.

Following the above decision General Appraiser Somerville held a complete electric launch shipped in aboard another vessel to be not subject to customs duties. T. D. 17405. In *The International*, 83 Fed. 840, aff. in 89 Fed. 484, a steam dredge and two scows were seized by the collector of customs for the district of Philadelphia to enforce the payment of certain duties assessed and claimed to be due upon said dredge and scows. The court held they were vessels, used or capable of being used as means of transportation, and hence not subject to tariff duties. A scow was the subject matter of a similar conclusion by General Appraiser Somerville in T. D. 24002. A small gasoline launch, fit for use as such, was held to be a "vessel" and not imported merchandise in T. D. 30354. In T. D. 31898 an iron steamship, the *Altenberg*, was purchased at Habana, Cuba, and navigated under her own steam into the port of Philadelphia. She was regu-

larly entered and the usual tonnage and port dues paid. Afterwards the owners, unable to sell the vessel, caused her to be broken up for scrap. The collector then assessed duties against the scrap as imported merchandise. The Board of General Appraisers held the *Altenberg* was a "vessel" when she entered the customs jurisdiction of the country and hence was not subject to customs duties.

In *Thayer* v. *United States,* 2 Ct. Cust. Appls. 526, this court, in a well considered opinion by Barber, Judge, had before it for consideration the dutiable status of two racing shells, imported at the port of Boston. They were assessed for duty as manufactures of wood; the importer claimed them to be "vessels" within the meaning of section 3, Revised Statutes. The court held the shells in question were not "vessels," as not being capable of being used for the transportation of "persons or property from place to place to any substantial extent or for practical purposes."

From these authorities some general conclusions may be deduced. In order to come within the definition of a "vessel" as fixed by section 3, Revised Statutes, the service upon which the thing in question can engage must be a maritime service. It must have some relation to commerce or navigation, or at least some connection with a vessel employed in trade. It must be engaged in, or in some sense related to commerce and navigation. The fact that the structure has the shape of a vessel, or has been once used as one, or could by proper appliances be again used as such, can not affect the question. The test is the actual status of the structure as being fairly engaged in or suitable for, commerce or navigation and as a means of transportation on water.

Applying these principles to the facts in the case at bar, it is obvious that the *Niobe* when brought within the customs jurisdiction of the country, was not a "vessel" within the meaning of section 3, Revised Statutes. It was not used, nor could it be used, in any way, in commerce or navigation, either in itself or in conjunction with other agencies of such commerce or navigation. It was absolutely useless as a means of transportation of persons or property on water and had no possible availability except such use as might be made of the materials of which it was composed, and such fixtures and appliances as might be attached to it.

It follows that the court below erred in holding the *Niobe* to be a vessel, as such subject to the navigation laws, and in dismissing the protest for lack of jurisdiction.

The decision of the Board of General Appraisers is reversed and the cause remanded, with directions to determine the issues involved on the merits of the respective claims of the parties.

*Reversed* and *remanded.*