(C. D. 733)

WILLIAM HERMAN WEPNER *v.* UNITED STATES

United States Customs Court, First Division

(Decided February 15, 1943)

*Lawrence & Tuttle* (*George R. Tuttle* and *Charles F. Lawrence* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Richard H. Welsh* and *Joseph A. Howard, Jr.*, special attorneys), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

WALKER, Judge: This suit against the United States involves the dutiable status of what is described on the *pro forma* invoice filed in connection with the entry as "One Br. Gas Screw gill net boat called *Francis*," which, it appears, arrived at the port of Anacortes, Wash., under her own power from Canada.

It was assessed with duty at the rate of 33⅓ per centum ad valorem under the provision in paragraph 412 of the Tariff Act of 1930 for "manufactures of wood * * * or of which wood * * * is the component material of chief value, not specially provided for," and the protest claim relied upon is as follows:

The Motor Boat covered by this entry is a vessel within the meaning of RS 3, 1 USC 3, and consequently is not subject to duty under any provision of the Tariff Act of 1930.

An alternative claim was made in the protest for duty at the rate of 15 per centum ad valorem under the provisions of paragraph 370 of the Tariff Act of 1930 as amended by the Canadian Trade Agreement reported in T. D. 49752, which covers "Motorboats, including yachts or pleasure boats, whether sail, steam, or motor propelled, valued at not more than $15,000 each." The term *"motor boat"* is defined in paragraph 370, however, and it is stated that such term "does not include a yacht or boat * * * built, or for the building of which a contract was entered into, prior to December 1, 1927." As it appears that the boat in issue was built in the fall of 1924, it would appear that paragraph 370 would have no application, and that claim was not pressed.

The evidence shows that the *Francis* was purchased in 1939 by the plaintiff. It was a gill net fishing boat, and although it was equipped for such work it was not used nor was it intended to be used for such purpose by the plaintiff, but rather was used as a pleasure boat. It was of 3 tons net weight, 29 feet long, 8-foot beam, drew about 3½ feet of water, and had an 8-horsepower engine, and also contained berths for two and had a cook stove. It appears to have been seaworthy enough to successfully undertake a trip from Seattle to Ketchikan, Alaska.

Section 3 of title 1 of the United States Code, cited in the protest, is a definition of the term "vessel" and reads as follows:

The word "vessel" includes every description of water craft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

The claim of the plaintiff for free entry is apparently made under the distinction generally made between "articles," which are made subject to tariff duties, and "vessels," which, except for certain specific types, or in certain situations, have been accorded freedom from taxation for customs purposes. This rule was expressed by the Supreme Court in the case of the *Conqueror*, 166 U. S. 110, 118, 41 L. ed. 937, 942, as follows:

But the decisive objection to the taxability of vessels as imports is found in the fact that, from the foundation of the government, vessels have been treated as *sui generis*, and subject to an entirely different set of laws and regulations from those applied to imported articles.

Although, of course, it had the power, it does not appear that Congress made any attempt to change or modify the rule of the *Conqueror* case until the enactment of the Tariff Act of 1922. It is true that in section 37 of the Tariff Act of 1909 an annual tax equivalent to a tonnage tax of $7 per gross ton as imposed on the use of "every foreign-built yacht, pleasure-boat or vessel, not used or intended to be used for trade, now or hereafter owned or chartered for more than six months by any citizen or citizens of the United States." In lieu of the foregoing annual tax an alternative provision provided

that the owner of such yacht, boat, or vessel might pay a duty of 35 per centum ad valorem thereon. It was held, however, in the case of *Frank A. Steele* v. *United States*, T. D. 30354, that such exaction was not a duty on imported merchandise but was made on the ground of ownership of the vessels and their use otherwise than for trade or commercial purposes.

The provision was repealed by the Tariff Act of 1913, but in the War Revenue Act of 1917, section 603 thereof (40 Stat. L. 318) imposed an annual tax on the use of pleasure boats of over 5 tons, and this provision was continued down to and including section 702 of the Revenue Act of 1926 (44 Stat. L. 95), being limited, however, beginning with section 1003 of the Revenue Act of 1921 (42 Stat. L. 297) to such boats when foreign-built.

In the meantime, when the Tariff Act of 1922 was enacted, it contained paragraph 370, which reads as follows:

Airplanes, hydroplanes, motor boats, and parts of the foregoing, 30 per centum ad valorem.

Here, we think, was the first indication of an intent on the part of Congress to depart from the policy expressed in the *Conqueror* case and to include certain vessels within the category of "articles" made dutiable by the provisions of the tariff laws on importation. This point was brought out in the case of *Roberts* v. *United States*, 17 C. C. P. A. 215, T. D. 43653, wherein at p. 220 it was said:

\* \* \*. It is quite true, as was stated in the opinion in the *Conqueror* case, *supra*, "that from the foundation of the Government, vessels have been treated as *sui generis*, and subject to an entirely different set of laws and regulations from those applied to imported articles." In 1922, however, Congress changed this policy, so far as those vessels which are motor boats are concerned, and provided for their taxation under the customs laws.

There is no doubt in our minds that had the *Francis* been imported during the life of the Tariff Act of 1922, prior to the enactment of the Revenue Act of 1928, it would have been dutiable under paragraph 370 of the act of 1922. However, when the bill which subsequently became the Revenue Act of 1928 was before Congress for consideration, it was brought out that the annual tax on the use of foreign-built yachts and motorboats conflicted in some measure with the provisions of the 1925 treaty with Germany, and in the Senate the annual tax provision was stricken out. In lieu thereof, however, an amendment was offered by Senator Reed of Pennsylvania as follows:

Sec. ——. Definition of the Term "Motor Boat."

The term "motor boat," when used in the revenue laws, includes a yacht or pleasure boat, regardless of length or tonnage, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof, whether or not such yacht or boat is brought into the United States under its own power, but does not include an instrumentality of trade or commerce nor any such yacht or boat built, or for the building of which a contract was entered into, prior to December 1, 1927.

Questioned as to whether the amendment was a tariff amendment, its proponent stated:

> Mr. President, I do not know whether it can be fairly called a tariff amendment or not, but it ought to be considered by the conferees in connection with the repeal of the tax on foreign-built yachts.
>
> There is in the House bill an annual license tax on foreign-built yachts which, because of certain complications under the treaty with Germany, was stricken out by the Finance Committee. If it is to be stricken out, and if the present decision of the Supreme Court is to stand, that a yacht which enters our waters under its own power is not an article of commerce, but an instrumentality of commerce, then the conferees ought to be free somehow to define the term "instrumentality of commerce." In that sense, I presume it is fair to call the amendment a tariff amendment, *but what we are trying to do is to accomplish the end on which we all agree, to continue the tax on foreign built yachts and still not violate the treaty with Germany.* (Cong. Record, Vol. 69, p. 9326.) [Italics added.]

The amendment was agreed to by the Senate, and, later, after conference, emerged and was finally enacted in the following language:

> Sec. 708. Definition of the Term "Motor Boat."
>
> The term "motor boat," when used in the act of September 21, 1922, includes a yacht or pleasure boat, regardless of length or tonnage, whether sail, steam or motor propelled, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof, whether or not such yacht or boat is brought into the United States under its own power, but does not include a yacht or boat used or intended to be used in trade or commerce, nor a yacht or boat built or for the building of which a contract was entered into prior to December 1, 1927. (45 Stat. L. 880.)

It will thus be seen that Congress definitely went on record that as to yachts or pleasure boats of any tonnage built on or after December 1, 1927, the rule of the *Conqueror* case was no longer to be applied. This provision was enacted in substantially the same language in paragraph 370 of the Tariff Act of 1930.

The foregoing has been set forth for the purpose of showing how the rule of the *Conqueror* case has been affected by acts of Congress. Whether it was the intent of the lawmakers, in enacting section 708 of the Revenue Act of 1928, *supra*, defining the term "motorboat" for the purposes of the Tariff Act of 1922, to exempt boats such as the *Francis*, which up to that time would have been clearly dutiable thereunder but which came under the exemptions specified in the section, does not appear. However, that is the effect of the definition, and it must be construed that it was the intent of Congress not to impose a tariff duty on such boats.

We are not unmindful of the fact that the duty assessed on the *Francis* was taken under the provisions of paragraph 412 of the Tariff Act of 1930, providing for manufactures wholly or in chief value of wood, not specially provided for. During the course of the opinion in the *Conqueror* case the court treated of such a classification as follows:

Not only is there no mention of vessels, *eo nomine*, in the tariff acts, but there is no general description under which they could be included except as manufactures of iron or wood. But it is only by straining the word far beyond its ordinary import, that we are able to apply the word "manufacture" to a sea-going, schooner-rigged, screw steamship, 182½ feet long, nearly 25 feet wide, and of 372 tons burden. The term "manufacture" is as inapplicable to such a vessel as it would be to a block of brick or stone, erected in the heart of a great city. A ship is doubtless constructed of manufactured articles which, if imported separately, would be the subject of duty, but which put together in the form of a ship are taken out of the class of "manufactures," and become a vehicle for the importation of other articles. Considering the hundreds of foreign vessels which enter the ports of the United States every day, it is incredible that, if Congress had intended to include them in the tariff acts, it would not have made mention of them in terms more definite than that of "manufactures."

It is argued by the defendant that the *Francis* was not a "vessel" within the meaning of the definition thereof in 1 U. S. C. 3, hereinbefore quoted, citing *Thayer* v. *United States*, 2 Ct. Cust. Appls. 526, T. D. 32252, wherein it was held that racing shells were not "vessels" within the sense in which that term is used in said section. In our view, the *Thayer* case contains observations by the court which support plaintiff's, rather than defendant's, position herein. The court, *inter alia*, said:

* * *. To give to section 3 the meaning claimed by the importer here is to say that any artificial contrivance, however small, provided it is used or is capable of being used as a means of transportation on water for however short a distance, makes it a vessel under the statutes. Were this literally so there would seem to be no escape from the conclusion that the "dugouts" or the rude rafts of primitive man, capable only of transporting little weight and for short distances in smooth water, would be vessels within the meaning of said section. But when it is considered that there are other provisions in the statute relating to the ascertainment of tonnage, the registration or enrollment, as well as licensing of vessels, we think it is obvious that Congress could not have meant by section 3 that every artificial thing that floats on water and of sufficient buoyancy to be used as a means of transporting anything, however small, is a vessel in the eyes of the law, but must have meant that *to be a vessel it must be capable of some substantial use as a means of transportation on water*. [Italics added.]

That the *Francis* was "capable of some substantial use as a means of transportation on water" is amply shown by the record. Also cited is the decision in the case of *Hitner Sons Co.* v. *United States*, 13 Ct. Cust. Appls. 216, T. D. 41175, wherein, after reviewing numerous decisions on the subject, the court said:

From these authorities some general conclusions may be deduced. In order to come within the definition of a "vessel" as fixed by section 3, Revised Statutes, the service upon which the thing can engage must be a maritime service. It must have some relation to commerce or navigation, or at least some connection with a vessel employed in trade. It must be engaged in, or in some sense related to commerce and navigation. The fact that the structure has the shape of a vessel, or has been once used as one, or could by proper appliances be again used as such, can not affect the question. The test is the actual status of the structure as being fairly engaged in or suitable for, commerce or navigation and as a means of transportation on water.

We think the references to "trade," "commerce," and "navigation" were not intended by the court to exclude pleasure boats from the category of "vessels," since the decision in the *Conqueror* case, which concerned a yacht or pleasure boat, was one of those from which the conclusions stated were deducted. Application of the test given in the last sentence of the above quotation, we think fairly places the *Francis* within the category of "vessels."

We note that in T. D. 37376, and again in T. D. 42913, instructions were issued to collectors of customs by the Assistant Secretary of the Treasury or the Commissioner of Customs that boats or vessels of less than 5 net tons should be assessed with duty at the appropriate rate according to the component material of chief value. The reason therefor was expressed in T. D. 37376 as follows:

> Inasmuch, however, as vessels of less than 5 tons net are not required to be documented, and only documented vessels are subject to tonnage tax, the department is of the opinion that the decision in the *Conqueror* case has no application to boats of less than 5 tons net, and that such boats should be classified for customs purposes in the same category as railway cars, automobiles, wagons, and other vehicles arriving in the United States. If coming into this country temporarily as the carriers of passengers or merchandise, they are not subject to customs entry or the payment of duty, but if brought into the United States permanently they are to be considered and treated as imported merchandise.

This argument was made in the case of *United States* v. *Porto Rico Coal Co.*, 17 C. C. P. A. 288, T. D. 43716, and the court disposed of it as follows:

> But it is argued by the Government that because the *Berwind* is undocumented, that is, neither a registered nor enrolled vessel, under the provisions of sections 4131–4196, Revised Statutes, as amended, and Chapter II, Customs Regulations of 1923, she may evade the payment of both tonnage and import duties—that, not having paid tonnage duties, she should be considered as dutiable merchandise. We are not called upon to decide whether the *Berwind* is or is not subject to tonnage duties as provided by the statutes. Ch. 3, secs. 4219–4227, R. S.; act of June 26, 1884, 23 Stat. 57; act of Feb. 5, 1897, 29 Stat. 511; U. S. Code, title 46, ch. 4, secs. 121–135, pp. 1467–1469. If she is not so subject, it is because of the exemptions provided by the law. The fact that she has a measurement of less than 5 tons net, and hence is not to be documented under the Customs Regulations above cited, does not affect her liability to tonnage duties; such liability is governed entirely by the statutory enactments providing for the collection of such duties. It is sufficient to say that she is of the class of property that, from our earliest national period, has been distinguished from imported goods, wares, and merchandise, and held not to be subjected to customs duties unless the statute otherwise expressly so provides.
>
> It is contended by counsel for the Government, and it seems to have been the opinion of the Treasury Department, that a certain expression in the opinion in the *Conqueror* case justifies the view that undocumented vessels are subject to customs duties. That expression is as follows:
>
>> We do not undertake to say that the same rule applies to canoes, small boats, launches and other undocumented vessels, which are not used, or are not capable of being used, as a means of transportation on water, as the word "vessel" is defined in Rev. Stat. Sec. 3. While these vessels have a limited capacity for transportation, they are ordinarily used for purposes of pleasure, and are not considered of

sufficient importance to require them to be entered at the customs house, or to be entitled to the special protection of the flag. They are treated like other similar vehicles used upon land, and there are reasons for saying that these boats, which do not ordinarily come of themselves into the country, but are imported or brought upon the decks of other vessels, are mere manufactures or other "articles," and are within the description of the tariff acts.

We can not agree that the quoted language is subject to such interpretation. This is but a statement that a certain type of small, undocumented vessel may be subject to customs duties as merchandise, under certain circumstances; but can not be treated as a statement that whether a vessel is documented or not shall be the test as to such dutiability.

We therefore hold that the *Francis* on her arrival in the United States was a "vessel" within the meaning of 1 U.S.C. 3, and, as she was not covered by the provisions of paragraph 370 by virtue of the exemptions therein, she was entitled to free entry under the rule of the *Conqueror* case. The protest claim is therefore sustained, and judgment will issue directing the collector to reliquidate the entry accordingly.